Mr. Koehn, on behalf of plaintiff Kelly Gahan, would you like me to proceed? Yes, you would. I apologize. No, I should have said the magic words. You may proceed. Thank you. Thank you, Your Honor. May it please the Court, what is this case about? To be sure, it's about whether the district court correctly applied Rule 56. It's about whether disputed issues of fact with respect to causation and reliance exist. It's about whether the learned intermediary doctrine applies on these facts. But make no mistake, the salient fact that this court cannot forget is that Sanofi designed, manufactured, marketed, and sold a drug, Taxotere, in its generic versions, which its own internal studies demonstrated could cause permanent alopecia. Nevertheless, Sanofi ignominiously failed to warn either healthcare professionals or ultimate consumers about that specific risk. Now, it's my understanding that the judges have read the brief, so I'm not going to lay much of a background. I'm just going to focus on the issues with my time. At the time, the plaintiff's prescribing physician, Dr. Borges, recommended the Taxotere-containing regimen. The label contained no warning regarding permanent hair loss, permanent alopecia. The only thing it warned of was hair loss. Dr. Borges testified in her deposition that this was a common side effect for chemotherapy. Thus, this vague, nonspecific warning did nothing to advise Plaintiff Gahan or her prescribing physician of the risk of permanent alopecia. And in this particular instance, it was Ms. Gahan— And then the record showed that they each knew of the possibility that the drug would cause complete hair loss. Well, that's an important question, Your Honor. Thank you for raising that. Let me say this. What, in fact, did the doctor and the plaintiff know? What they knew was that one doctor had done a limited study with a limited number of patients. Her own doctor advised her not to put any weight on Dr. Sedlicek's study, that one oncologist. Her own doctor told her that out of hundreds of patients she had treated, only three had ever had permanent hair loss. And so in this instance, when you say no, the question is, what did the plaintiff know? Sanofi wants to make the argument, in this particular instance, that there was correlation without causation, right? Sanofi wants to say, oh, that because she had some anecdotal information, she knew of the risk. Well, that's not true. And by the way, that's not the law in Colorado. The law in Colorado is that the manufacturer is required to provide a warning with respect to specific risks. And under the strict liability standard, it has to warrant regardless of whether there is a causal relationship, I'm sorry, a definitive causal relationship established in any event. And that's under the Hamilton case, you can find that reference. Counsel, let me ask you, what do you think the warning should have been? I mean, it's my understanding that now the FDA has a required warning that there are known cases of permanent hair loss. And is that what you're saying the warning should have been? Are you saying the warning should have been even more specific or more significant than that one? I guess from plaintiff's perspective, and keep in mind, your honor, the question of whether a warning is adequate in the state of Colorado is a question for the jury. And so I could sit here and pontificate about what an adequate warning would be. However, the ultimate issue in this question is, is whether the district court properly granted summary judgment on these facts. Right. But the reason I ask the question is because it does seem like the plaintiff's oncologist knew what is now on the warning, which is that there are known cases of permanent hair loss. I mean, that does seem clear from the record. I think she had three of her own patients who had had permanent hair loss. And then there's these studies that, you know, there's the debate about how meaningful those studies were. But would you agree that the known cases of permanent hair loss? I would agree with the court that the oncologist knew that there were known cases of permanent hair loss. What I would not agree with the court is the underlying premise that the oncologist knew that that permanent hair loss was caused by the taxidermist. What would it have been caused by? Well, your honor, I don't know. I'm not a medical expert, but the bottom line is, is the if under Colorado law, if a manufacturer is aware of a risk, they are required to provide a warning. In this case, they didn't. I mean, we can reach, we can reach into the ether and look for all kinds of reasons. But when you're a doctor treating, they're required ultimately, though, I mean, as I would understand Colorado law, and you may know a lot more about it than I do, but that ultimately the question is causation. Irrespective of the warning. The question is whether the absence of the warning was the cause of the injury. And here where the, each of the, the doctor and the patient were aware of the injury that would be caused by the product, then the absence of a warning is not the cause of her injury. That's the way your, the problem that you've got to address, it seems to me in order to prevail. Thank you, your honor. I appreciate that. And I guess I would, I would draw back to the original point. The, under Colorado law, not even an open and obvious, open and obvious danger will, will, will vitiate the requirement for a warning, right? That's how expansive Colorado law is, right? And so the question, the question that keeps, I think, hanging us up here is this, is what they knew. Are you saying there's no causation requirement for this claim? I mean, the district court didn't say that the defendant acted properly and gave a proper warning and all that. It just said, assuming there was a problem, there was no causation because of what the doctor and patient knew, which, which you may disagree with that, but I mean, isn't that really the issue? I guess, I don't read the district court as saying that the company, the defendant acted properly in any way. That wasn't what it ruled on. Well, I apologize. I didn't mean to go ahead. I guess I would say this with respect to that. In Colorado, the question of proximate cause is a question of fact for the trier of fact, unless it's, unless, unless minds can only come to one interpretation. And what I'm saying here is, is that to put any, to put any weight on anecdotal knowledge for the purpose of saying, well, you knew there was this risk of right? That's the question the jury has to determine. It is inappropriate for a ruling on summary judgment. Yes, it is undisputed that the doctor in this case had some information. It is also undisputed that the patient had some information, but when you look at it through the eyes of the patient, and here's where I want to make absolutely clear, the learned intermediary doctrine does not apply in the state of Colorado under this set of facts. So to the extent that the court relied upon the learned intermediary doctrine, we believe that that was a mistake of law. And at this court, we're going to say that the learned intermediary doctrine does apply in this, on this set of facts, then we would respectfully ask that this court certify that question to the Colorado Supreme court, because we will be more than happy to slug it out with the Colorado Supreme court here in Denver. Now, turning back to your question, your honor, I guess I would say this, the, the doctor herself informed the patient that she would put no weight on Dr. Sedla's sex study, right? The doctor herself informed the plaintiff that it was, that it was not clinically significant that she had three patients out of hundreds of patients that, that, that, that had experienced this permanent hair loss. Now, when you have your own doctor telling you, right, that, look, I wouldn't put any weight on this. This isn't clinically significant. What? We're going to attach that knowledge to the, to the plaintiff? See, this is the problem with applying the learned intermediary doctrine in a case such as this, where there's absolutely no warning and the court will note for my briefs, and I'm not going to go back through them here because of my time, but the court will note from our briefs, look, numerous cases across this country have held. You can't be a learned intermediary. If you don't provide a warning, the entire learned intermediary doctrine is based on an adequate warning. In the O'Connell case in Colorado says that. Numerous other cases around the country say that. The Kaveny case relied upon by the O'Connell court stated the same thing. The comments to section 6D of the restatement third of torts product liability says the exact same thing. Application of the learned intermediary doctrine and what the doctor knew or didn't know is simply irrelevant here, and the reason is because the tort duty rule is this, is a manufacturer has a duty to warn all foreseeable users, all foreseeable users, of the inherent risks in this product. Let me say this about the learned intermediary doctrine, because I think this is the crux of the problem in this case. And by the way, I just want to point out, Sanofi in their response brief never even addressed any of the cases that say, look, the learned intermediary doctrine does not apply when there hasn't been an adequate warning. But moving back to the learned intermediary doctrine itself, here's the thing. That doctrine is a repugnant attack on plaintiffs, and here's why. Because defendant manufacturers use it as both a shield and a sword. They use it as a shield to say, look, our duty is only to warn a prescribing physician. And then what do they do? They turn around, just like in this case, and they say, look, we didn't provide any warning, we didn't provide much less than adequate warning, and now we're going to use this doctrine as a sword to say, well, you know, the chain of causation is broken if the doctor wouldn't have changed their prescribing decision. Luckily for us, number one, the learned intermediary doctrine just doesn't apply based on the facts. I've already addressed that. But number two, the salient fact that this court needs to find it, understand, is that Dr. Borges testified that while the taxatier regimen was her preferred regimen, she would have prescribed whatever the right. And if you look back at the Colorado case law, I think it's Hamilton versus Hardy, it talks about this idea that the decision-making process is not solely in the hands of the doctor. It is a coordinated effort. That is the doctor- Counsel, if I can stop your flow for just a minute there. It seems to me that, I want to make sure I have a fair understanding of the facts, not the physician here, not the plaintiff physician, but the prescribing physician, she still would have prescribed taxatier even knowing now what is presented in this case. And if that is so, it does, and this is what the premise of learned intermediary applies, which is, we'll hear from the other side in a moment about whether that's true or not. And if that's so, it seems to me your principal argument is, regardless of that, it's a collaborative decision and it's up to your client to make the ultimate decision. And she has a different view about what she would have done. But first address what I'm true on the facts. Did the prescribing physician say she still would have recommended taxatier? Well, if I remember the record correctly, your honor, I believe she said both. Said, yes, she would have still prescribed even if she got the warning, but she ultimately, she would have done, her role is to sort of guide the patient and ultimately she would have prescribed what the patient requested, right? And you have to remember the, and I'm running out of time, but Ms. Gahan tried to learn as much as she could. It is specious to say that a warning would not have played a factor in her decision. Thank you. All right, Mr. Kane. Good morning, your honors. Alana Eisenstein on behalf of defendant appellee Sanofi Aventis. May I please look forward? Your honor is telling that counsel for plaintiff tries in every which way to avoid the essential element of causation. And Colorado law is clear and it comes from basic tort principles that whether it's a warnings case or any other kind of tort, causation is essential element of the claim. And here in a warnings causation case, the path is very well trod. Causation can be dispelled in a number of ways. And here there are two ways, either are sufficient to break the causal chain. And your honors have already alluded to this in the questions that you've asked my friend on the other side. First, there's no warnings causation because Dr. Borges and indeed Dr. Gahan knew of the risk of and proceeded with the taxidermist regimen aware of that risk. And second, there's no warning. Ms. Eisenstein, one of the things the plaintiff herself has said, she knew there were clinical studies of some validity as opposed to what was known at the time and was not considered to be a reasonable clinical study, anecdotal evidence, whatever, that that would have impacted her. What do you do with that piece of evidence? So, so your honor, I have two points to that. One is in terms of the clinical studies that she says she would have wanted to know about, which were the tax 316 and tax 301 studies that were Sanofi's internal clinical studies. Those studies didn't reflect anything different than what the information was she already knew. She had the Sublacheck study, which showed 6.3% of those patients. And then the information. Here, it seems to me that the point, and you said two points and maybe the second one would have covered this, but it seems to me what she is saying, the plaintiff is saying is, I'm a doctor, I'm a professional. I know you can get anecdotes. What I wanted is something that was more professionally or scientifically done. And that's why this other study would have been more meaningful to me. Now, one of the things you say in your brief, I think, is that these studies are not required to be published. But even if that's so, it seems to me there'd be some reference to them where it was known that a clinical study of some sort was done. So it does seem to me there is still the issue of the persuasiveness to the patient of a better study. So what your honor just suggested, which is what is a warning versus what is a study? A study is not a warning. A warning is something that's attached to the product itself. In the pharmaceutical context, it's the label. And the label, after FDA evaluated these very studies, the very studies that plaintiff is pointing to, changed the label to say cases of permanent alopecia have been reported. Frequency, not known. So the incidence rate was not on the label. In fact, the plaintiff in their briefing here, as well as in the deposition testimony, as well as Dr. Borges, all agree, there's no dispute, that there is no known incidence rate for permanent alopecia connected to Taxotere. So the anecdotal evidence that the plaintiff points to is really even to the studies that don't show anything different. Can you stop for just a minute, counsel? Stop the clock. The audio is breaking up. Are you noticing that, Kim? Why don't you start again, Ms. Eisenstein? Yes, your honor. Yeah, can you hear me now? No. You technical people tell me what we need to do. Let her keep talking and see if it's clear. You're not technically people who are technicians. I can try dialing in if that's more helpful. That's good. That's clear. Okay. Better? Yes. Sorry about that. So the information that's on the label that the district court in a separate opinion in the MDL found to be adequate is no more informative than the information that Dr. Borges and Gahan had at their disposal at the time they made the decision. But there's more. There's a second way in which causal association is broken, which is that Dr. Borges evaluated all of this information, including a potentially stronger label, and said, even with a stronger label, even with the studies that plaintiff has pointed to in her briefing here on appeal and has presented in the district court, I still would have made the same recommendation. I still would have prescribed taxatier-based regimen because it was the most effective. Just a few of her words, I think, are very informative. She says, what I would recommend to her then and what I would recommend to her now is that she takes TCH, the taxatier-based regimen. She says, in a different place in her deposition, never in a million years would she have stopped giving women taxatier because it's so effective. So keep in mind that the risk that is being discussed here, which is, I don't want to minimize it, permanent hair loss, but you have to keep in mind that we're talking about chemotherapy, which itself bears substantial risk, as well as a treatment of a very serious disease of, in her case, HER2-positive breast cancer. What I'm interested in is exactly what did the plaintiff say the effect of the warning would have had on her. Did she say, I might have made a different decision? Did she say, I would have made a different decision? Exactly. How did she respond to the fact that her knowledge would have weighed against any kind of warning? So Judge Jolly, she never stated what she would have said based on the 2015 label or based on just the mere fact of the warning appearing on the label. Instead, her testimony was all over the in terms of whether she would have rejected her doctor's recommendation and gone against doctor's advice to use an alternative regimen. She said she may have refused taxatier if there was, quote, definite evidence of a link. In another place, she said if there was a one in a million chance, she would have refused it. In another place, she said she would have chosen the drug with the lower percent, 3%, but then she admits we don't know the true incidence and we don't have on the label a causal connection. It's just cases of permanent alopecia have been reported in the 2015 label, eventually deemed adequate. So while she says... Ms. Eisenstein, one of the things Mr. Kane said is, just getting to what this particular doctor said, the causation of the hair loss, would it have been clear at the time of the treatment? Is it clear now that it's actually taxatier that is causing the hair loss? No, that has not been established. I mean, that's a disputed point in this litigation. And one said, if he takes the position that there has been no established causal link in this litigation, but we don't need to decide that one way or another here, because we are in summary judgment. So we'll take it for purposes of summary judgment, you know, that we can't establish that fact, but... My understanding of the record is there was a suspicion that taxatier was the cause and some other regimen of drugs would have avoided at least taxatier's risk of permanent hair loss. I mean, is that a fair assessment? I think that's a fair assessment of this record. Yes, Your Honor. Summary judgment, as you say, of their evidence. Summary judgment. But Your Honor, there's also a legal issue around what the plaintiff would have said. And this comes back to the point about the application of the learned intermediary. So there's a good reason why the learned intermediary requires a manufacturer to warn the doctor, not the patient. The learned intermediary is about duty. The duty of a manufacturer of a prescription drug runs to the prescribing physician, not to the patient. And please just agree that that's the duty under Colorado law. And O'Connell, even the Hamilton decision that they cite as somehow avoiding causation recognizes the learned intermediary doctrine as do all of the federal courts that have applied Colorado law. So I don't think there's any real doubt that the learned intermediary doctrine does apply. Counsel, the opposing side and the district court seem to think that chemotherapy might be different because the patient is so involved in selecting the treatment. What's your response to that? I think that the way that the district court looked at this is that informed consent remains important and that the discussion between doctor and patient is an important factor in determining warnings causation. But that doesn't change the fact that ultimately the question is whether the prescribing decision would have changed and whether the parties knew of the relevant risk. And so I think when my when plaintiff's counsel suggests that the learned intermediary doctrine doesn't apply, what he's really trying to say is this court should ignore the causation element. That's really what it's short for is that he seems to suggest that whether it's strict liability doctrine under Colorado law or under certain cases in Colorado law that causation is simply dispensed with. And he's trying to say that causation should focus on his client, not on oncologist. And there he says it's unclear what would have happened if she'd known what's currently out there. I mean, that seems to me it's not so much that there's no causation, just that the focus should be on his client in terms of causation instead of on on the oncologist. Well, I would hope that that potentially focuses on his patient on his client, the patient, that there is a dispute about causation. No, I do not, because I think that Ms. Gahan did know about the risk. She was warned of the risk. She evaluated it carefully. She had at her disposal not only the cases of permanent alopecia that were reported at the time, but also clinical studies that showed a rate of a rate of clinical of alopecia in line with those that she believes other studies might show, even though she admits no incidence rate is known. And she never says that if it simply had said cases of permanent alopecia have been reported, which is all we really know on the label today, that she would have refused Dr. Borges' recommendation. And in fact, here's another factual point on Gahan's testimony. Gahan was clear that she deferred to Dr. Borges' advice. And this is, I think, a really important point when it talks about whether or not you can dispel causation based on a patient's refusal to adhere to doctors' advice. The learned intermediary says we don't look that far. So, my first point to this court is, once the doctor says, I wouldn't have changed my prescribing decision, that should be the end of the story under traditional learned intermediary principles, which apply here. But even if you go further, Gahan testified repeatedly how she deferred to Dr. Borges' advice. She remembered that Dr. Borges told her that the only patient who ever died was a doctor's wife who didn't listen to her. She admitted that she didn't dictate her own care because Dr. Borges cautioned her about being her own doctor. And she testified, I'm not going to override my expert oncologist. She knew that even though she herself was a medical doctor, she knew that she had to defer to Dr. Borges. And Dr. Borges, it's crystal clear, TCH, the taxateer-based regime, was her preferred regime, especially for the kind of cancer that Gahan had, what's called HER2-positive cancer. So, here, there's the legal issue, which is that the focus is on the doctor. This court's decision in Stahl and Ackerman, you've made clear that the focus of the analysis when it comes to warnings in a pharmaceutical context is on the prescribing physician's decision. We have Gahan saying, I defer to my doctor. And then when it comes to what would have been the hindsight testimony about what would have been her choices, she is all over the map. And it's not creating a dispute of fact because these are just wildly inconsistent statements about it. What risk threshold, one that we don't even know today, would she have made a different choice? This type of hindsight testimony is just not the sort of objectively reasonable analysis that courts have looked to in saying would an informed failure to give informed consent, for example, have broken the causal chain because the patient would have refused care. And we think that that's the appropriate analysis. But even subjectively, Gahan's inconsistent testimony on this issue doesn't get to the point where she demonstrates that she would have somehow refused this treatment that her doctor thought was the most effective for saving her life and treating her breast cancer. As I said, one concern I have about how much the patient's views affect what we do or the adequacy of the warning. This is not Colorado law, but the quote I'm about to give, but it is, I think, fairly standard law for an intermediary, that it must be shown that but for the inadequate warning, the treating physician would not have used or prescribed the product. Now, any variation in Colorado, you can certainly raise with me. But it seems to me that the product is not prescribed until the physician decides actually to prescribe it, which would mean for chemotherapy, it would be the drug that the nurses or the doctor herself is actually using. So if there was more information along the lines that Mr. Kane is saying for the physician, and this conversation happened with the patient, and the patient did whatever she wanted to do, could well be a taxotere would not be prescribed. How does that play out in your understanding of Colorado law? Why isn't the, when we're looking at causation, why isn't a better warning that might have changed the conversation with the patient and ultimately changed the prescription? Why isn't that relevant? Well, let's just talk about, I think it could be relevant. But when we talk about a better warning, Your Honor, the warning that we're talking about is still anecdotal evidence that cases of permanent alopecia have been reported. Clinics have not come forward with anything different than that, which is telling. Move beyond that. Let's say that there would have been a warning that would have caused potentially, and maybe there's no evidence of that, the patient to say, no, I don't want to taxotere. Are you saying that that is irrelevant? I'm not saying it's irrelevant, Your Honor. I think that the way you put it, that changed the conversation between the doctor and the patient in a meaningful way, in a material way, in a way that would have ultimately led to a different prescribing decision is key. But we simply don't have those facts here for all of the reasons we talked about, because the I would not have taken statements from the plaintiff are all based on unfounded and unproven hypotheticals. They're about incidence rates that simply are not in the record. And I do want to point out one thing that's prevalent in the focal point of the brief, though I didn't hear an argument today. Plaintiffs point to the 6.9 to 8.4 percent that they claim the Sanofi study showed, and we know that's consistent anyway with what Sedlacek showed. But I also want this court to recognize that percentages have no record basis. That's taken out of context from Dr. Borges' testimony, where she makes clear she doesn't recall the incidence rate in the study in question. She says, I have it on my desk. I have to go look it up. And she says it's somewhere on the order of is one of them's like. And then just later on that same page, this is at 2-1-3-2 to 2-1-3-4 of the record. She says the studies are, quote, not comprehensive enough to present a rate. There's case reports, which you can't derive a rate from. What she's talking about there is the present-day studies, the studies that plaintiffs say should have been disclosed and been part of a conversation. So I just want to be very clear that all of the I would not have taken hypotheticals are based on a series of supposed incidence rates or relative risks. Because remember, the choice is not taxateer or go-home safe. The choice is taxateer or other alternative therapies that have carried with them very severe other risks, risks like cardio, myopathy, risks like leukemia that's secondary to the chemotherapy, as well as a question mark about efficacy. And so when you're talking about balancing these risk benefits, that's exactly where the learning intermediary is at its zenith. And when you have Dr. Gahan saying, well, if it was one in a million, 3%, they were just slightly not in equipoise, that does not create a genuine issue of fact on causation. It highlights why the learning intermediary doctrine is an important doctrine, one that Colorado has recognized most importantly, and that focuses the effort on the prescribing physician and what the prescribing physician would have recommended. And in this case, this particular risk was extensively discussed between Dr. Borges and Dr. Gahan. They evaluated and knew that this was a potential risk and nevertheless proceeded with this regimen. And Dr. Borges would have done the same thing again. Her testimony is clear about that. And that should be the end of the analysis. But even if you move on, Dr. Gahan's own testimony does not create an issue of fact on the basis of causation. So as a result, this court should affirm the decision of the failure to establish causation. There's no further questions. Thank you. Mr. Cain? Can you unmute him? Can you hear me? Go ahead. Perfect. Thank you so much. This court, because this is a diversity case, this court is required to predict what the highest court of a state would do. In this particular case, the Colorado Supreme Court has never passed on the learned intermediary doctrine. While this court can look to intermediate appellate courts, the fundamental thing this is, it applied the learned intermediary doctrine in the realm of medical devices, not a prescription drug. It did talk about prescription drugs. But here's the key point. That case left open the question of what happens when the warning was inadequate. As a matter of law, if there's no warning about a specific risk, there can be no question that warning is inadequate. Now, Ms. Eisenstein talked about the law of informed consent, which is interesting, because in Colorado, the test is an objective one. It is an objective one for informed consent. Nevertheless, if you look at the Miller v. Van Newkirk case, 628 Pacific 2nd, 143 at 147, that's a Colorado appellate case from 1980. It's specifically, and then another case, Hawley v. Wang, which is 284 P. 3rd, 81 at 84, Colorado appellate 2011. You come away with this principle, and that is that even though it's an objective test, what the plaintiff said they would have done, the plaintiff's own subjective beliefs, is evidence of what a reasonable person would have done. In the Hawley case, it was that situation that caused the Hawley court to say, on that basis, the question goes to the jury. Now, Ms. Eisenstein has spoken repeatedly about what the plaintiff knew, and she keeps The frustrating thing in this case is that Sanofi wants this court to buy into the argument that if there's anecdotal evidence out in the world about some perceived risk, then by golly, they're off the hook. As I talked to you earlier, in Colorado, not even an open and obvious danger vitiates a warning. Open and obvious. In this case, we need to stay focused on the law of Colorado. It doesn't matter what the law is in any other states. We looked at the cases, even the Reyes case handed down by this court, that was based on Texas law. Then there were a number of cases cited by the defense that cited Arkansas law and other things like that. The bottom line is, we have to stay firmly two feet in Colorado law. Now, Judge Jolly asked a question earlier, talking about what else could have caused the permanent hair loss. I just wanted to point out that there's numerous things that could have caused permanent hair loss. The multi-drug chemo regimen, hormone therapy, simple aging, female pattern hair loss, all of those were potential causes. The reality is, is when we assign knowledge, when we assign knowledge to the point to say, look, this breaks the causal chain, it defies Colorado law. Because once again, that proximate cause here in our state, that's a question of fact. It is not appropriate for summary judgment. And listen, what Ms. Eisenstein is talking about, she's weighing the facts. She's not saying there's no disputed issue of material fact. She's saying the facts in this case, Judge, should be so overwhelming that there's no dispute. And that's simply not the case, as pointed out by the facts in our brief. What case shows that Colorado has such a different view of the learned intermediary doctrine than all these other courts? I mean, you're right, of course, that the focus is Colorado law. But generally, absent some indication, state courts try to be consistent in areas like tort law. I don't understand that question. Can you rephrase that question? Sure. You were saying all these states, Texas, Arkansas, that might be the law in those states, but Colorado has different law when it comes to the learned intermediary doctrine. Oh, thank you. What case suggests that Colorado has a different version of this doctrine than the prevailing view in other states? I'm out of time. May I answer? Yes, go ahead. If you look at, for instance, the Reyes case, right? My understanding is the learned intermediary doctrine is part of their product liability statutes. It's the same, I think, in the Arkansas cases cited by the defendant. They have an actual developed body of law on this statutory law on the learned intermediary doctrine. The point I'm trying to make here in Colorado is that the O'Connell decision was the nascent opinion. It was sort of the watershed moment. While it said it applied in that specific circumstance, it specifically left open the question of what happens next. I don't know if the court read that case, but in that case, the plaintiff failed to allege at the district court, at the trial court in Colorado, that the warning was inadequate. The Colorado Court of Appeals says, you waive the other states of a more developed body of law. We don't have that. That's why plaintiff invites this court, look, if you're going to say the learned intermediary doctrine actually applies, then, like I said, we invite you to certify this question to the Colorado Supreme Court. All right, counsel. I think you've answered Judge Koster's question. Thank you. And some other questions too, maybe. Thank you. I thank you both for your assistance on this case. We'll take the case under advisement. Thank you.